**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEAL DEBENEDETTO, | |
| Plaintiff, | |
| v. | Civil Action No. 21-8050 (MAS) (DEA) |
| LACEY TOWNSHIP BOARD OF EDUCATION *et al.*, | **MEMORANDUM OPINION** |
| Defendants. | |

**SHIPP, District Judge**

This matter comes before the Court on separate Motions to Dismiss Plaintiff Neal DeBenedetto's ("DeBenedetto") Amended Complaint filed by Defendants Lacey Township Board of Education, Mark Angelo, and Gregory Brandis (collectively, the "Lacey Defendants") and by Defendant Ocean County Vocational Technical School ("Ocean," and together with the Lacey Defendants, "Defendants"). (ECF Nos. 10, 14.) DeBenedetto opposed both motions (ECF No. 15), and Defendants separately replied (ECF Nos. 16, 17). The Court has carefully considered the parties' submissions and decides the motions without oral argument under Local Civil Rule 78.1. For the reasons below, the Court denies Defendants' Motions.

**I.   BACKGROUND**

In 2018, DeBenedetto was a sixteen-year-old high school junior dually enrolled at Lacey Township High School and Ocean County Vocational Technical School. (Am. Compl. ¶ 9, ECF No. 3.) On February 10, 2018, while at home, DeBenedetto tweeted, "I ordered 5.56 45mm bullets

yesterday and they're already in NJ? Like bless the post office there some hard af workers[.]" (*Id.* ¶ 11.) According to the Amended Complaint, DeBenedetto ordered these bullets for a "bullet belt," which is "a belt with fake bullets" that is "often worn by heavy metal musicians as part of a musical act." (*Id.* ¶ 10.) Four days later, the tragic shooting at Marjory Stoneman Douglas High School unfolded, where a nineteen-year-old former student killed seventeen students and wounded seventeen more. (*See id.* ¶ 13.) The next day, while at home, DeBenedetto reposted a Snapchat post of a South Carolina student holding a gun with the text "Round 2 of Florida tomorrow[.]" (*Id.* ¶ 15.) DeBenedetto added his own text to the Snapchat repost, "Fucking bless this mans[.]" (*Id.* ¶ 16.) He deleted his repost and text shortly after. (*Id.* ¶ 18.)

Word got back to Defendants about DeBenedetto's social media postings. (*Id.* ¶ 19.) They investigated the posts and took action: the Lacey Defendants suspended DeBenedetto for "inappropriate use of technology," and Ocean suspended DeBenedetto for "disorderly conduct." (*Id.* ¶ 22.) In addition, DeBenedetto's Amended Complaint asserts that Defendants subjected him to "extensive psychiatric evaluation" and "long term suspension." (*Id.*) Following that discipline, DeBenedetto sued Defendants under § 1983 and the equivalent New Jersey statute. (*See generally id.*) After DeBenedetto amended, Defendants moved to dismiss the Amended Complaint. (ECF Nos. 10, 14.)

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2)[1] "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

---

[1] All references to a "Rule" or "Rules" hereinafter refer to the Federal Rules of Civil Procedure.

A district court conducts a three-part analysis when considering a motion to dismiss under Rule 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of the plaintiff's well-pleaded factual allegations and construe the complaint in the light most favorable to the plaintiff. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). The court, however, may ignore legal conclusions or factually unsupported accusations that merely state "the-defendant-unlawfully-harmed-me." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678). On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

### III.   **DISCUSSION**

This case requires the Court to wade into the murky waters of off-campus student speech. Defendants contend that they did not commit a constitutional violation in suspending DeBenedetto because prevailing circuit law provides that schools may regulate off-campus speech. (*E.g.*, Lacey Defs.' Moving Br. 4-10, ECF No. 10-1.) Separately, Ocean adds that to the extent DeBenedetto alleges a claim under *Monell v. Department of Social Services of New York*, he fails to allege an applicable custom or policy. (Ocean's Moving Br. 11 (citing 436 U.S. 659 (1978)), ECF No.

14-1.)² DeBenedetto retorts that circuit law clearly establishes that schools cannot regulate off-campus speech and that the Amended Complaint sufficiently alleges a *Monell* claim. (Pl.'s Opp'n Br. 8-18, ECF No. 15.)

The Court begins with the Amended Complaint's asserted causes of action under § 1983 and the New Jersey Civil Rights Act (the "Act"). To state a claim under § 1983, DeBenedetto must allege that a person acting under color of state law violated a constitutional right. *Kadonsky v. D'Ilio*, No. 14-8104, 2016 WL 3606780, at *2 (D.N.J. July 1, 2016) (citing, among others, *Morrow v. Balaski*, 719 F.3d 160, 165-66 (3d Cir. 2013)). Courts analyze claims under the Act analogously. *Pettit v. New Jersey*, No. 09-3735, 2011 WL 1325614, at *3 (D.N.J. Mar. 30, 2011) (listing cases). For both claims, Defendants dispute only that they violated the First Amendment. (*E.g.*, Lacey Defs.' Moving Br. 4; Ocean's Moving Br. 6.) The Court thus analyzes whether the Amended Complaint sufficiently alleges a First Amendment violation as of February 2018.³

Taking all inferences in favor of DeBenedetto, the Court concludes that the Amended Complaint states a constitutional violation under the First Amendment. A host of U.S. Supreme Court and Third Circuit precedent guides the Court's conclusion. To start, schools may regulate student speech where that speech "materially and substantially disrupt[s] the work and discipline of the school." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969). In *Tinker*, the U.S. Supreme Court held that a high school could not discipline students wearing black

---

² Neither the Lacey Defendants nor Ocean invokes a qualified-immunity defense.

³ Both parties make much of the Third Circuit's and the U.S. Supreme Court's recent holdings in *B.L. v. Mahanoy Area School District*, 964 F.3d 170 (3d Cir. 2020), *aff'd but criticized in* 141 S. Ct. 2038 (2021). Those decisions, however, were not binding law in this District at the time the purported constitutional violation occurred. Absent explanation from the parties, the Court does not consider these cases relevant. It also notes, however, that even considering these decisions, neither alters the outcome the Court reaches today.

armbands to protest the Vietnam War, describing the expressive speech as "a silent, passive expression of opinion, unaccompanied by any disorder or disturbance." *Id.* at 508. The school's "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint" thus could not outweigh the students' First Amendment right to silently protest. *Id.* at 509-10. That weighing led to the Court's now-famous articulation that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id.* at 506.

*Tinker* notwithstanding, subsequent cases carved out more avenues for schools to regulate student speech. In *Bethel School District No. 403 v. Fraser*, the Court upheld a high school suspension of a student who gave a vulgar and sexually charged speech to an in-school assembly. *See* 478 U.S. 675, 678 (1986). The Court reasoned that schools had a weighty interest in regulating "lewd, indecent, or offensive speech." *Id.* at 683; *see also Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 213 (3d Cir. 2001) (same). Next, in *Hazelwood School District v. Kuhlmeier*, the Court upheld a high school's censorship of articles in a student newspaper about teen pregnancy. 484 U.S. 260, 263-66 (1988). The Court emphasized that the student newspaper was "school-sponsored" so the high school could "exercis[e] editorial control over the style and content . . . so long as [its] actions [were] reasonably related to legitimate pedagogical concerns." *Id.* at 273. More recently, the Court decided *Morse v. Frederick*, where it upheld a school's suspension of a student who raised a banner with the phrase "BONG HiTS 4 JESUS" at a school-sponsored event. 551 U.S. 393, 396-97 (2007). The Court reasoned that schools have a special interest in "deterring drug use by school children" and rejected the argument that the school could not discipline the student at an off-campus event. *See id.* at 400-01, 407 (citation omitted). Rather, the Court agreed that the

school could regulate a student who "stand[s] in the midst of his fellow students, during school hours, at a school-sanctioned activity." *Id.* at 401.[4]

The upshot of these seemingly conflicting precedents is that although students do not shed their constitutional rights at the schoolhouse gate, some confusion abounds as to where that gate opens. *See Morse*, 551 U.S. at 401 ("There is some uncertainty at the outer boundaries as to when courts should apply school speech precedents . . . ."). What is clear is that schools seeking to regulate speech must, at a minimum, show some type of nexus between the school and the place from which the speech occurred. Similarly, schools must show a relationship between the speech and the school setting—often but not exclusively by showing a substantial disruption. The student-speech cases before the Court align with these principles. In *Tinker*, the speech occurred on-campus but bore little relation to the school; the speech dealt with the Vietnam War and did not cause a substantial disruption. *See* 393 U.S. at 508. In *Fraser*, the speech also occurred on-campus and related quite a bit to school activities—it occurred during an assembly for a "school-sponsored educational program" and was jarring for younger students in the assembly. *See* 478 U.S. at 677, 683-84 ("The speech could well be seriously damaging to its less mature audience, many of whom were only 14 years old and on the threshold of awareness of human sexuality. Some students were reported as bewildered by the speech and the reaction of mimicry it provoked.").

*Kuhlmeier* and *Morse* began testing the limits of the school's regulatory ambit. In those cases, threshold questions arose about the boundaries of the school's authority because the students

---

[4] Worth noting is just how narrow the Court's holdings in *Kuhlmeier* and *Morse* were. *See Kuhlmeier*, 484 U.S. at 273 (limiting holding to schools that "exercis[e] editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns"); *Morse*, 551 U.S. at 423 (Alito, J., concurring) ("I join the opinion of the Court on the understanding that the opinion does not hold that the special characteristics of the public schools necessarily justify any other speech restrictions.").

established that some parts of the speech may not have occurred within the four walls of the school. *See Kuhlmeier*, 484 U.S. at 270 (noting that students were permitted some control over student-newspaper content); *Morse*, 551 U.S. at 397-98 (noting that speech occurred off school grounds at school-sponsored event). Nevertheless, the Court did not need to grapple with the reach of schools' authority because the schools established a sufficient nexus between the place the speech occurred and the school's degree of control over that place. *See Kuhlmeier*, 484 U.S. at 271 (noting that school-sponsored publications "may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences"); *Morse*, 551 U.S. at 400-01 (detailing relationship between school-sponsored event and the school itself).

Precedent from the Third Circuit further echoes these principles. The *Layshock* litigation is instructive. *Layshock ex rel. Layshock v. Hermitage Sch. Dist. (Layshock I)*, 496 F. Supp. 2d 587 (W.D. Pa. July 10, 2007); *Layshock ex rel. Layshock v. Hermitage Sch. Dist. (Layshock II)*, 650 F.3d 205 (3d Cir. 2011). There, a seventeen-year-old high school student created a social media "parody profile" of his high school's principal. *Layshock II*, 650 F.3d at 207-08. The profile included a question-and-answer-style survey. A sampling: "In the past month have you smoked: big blunt," "[e]ver been called a Tease: big whore," "[e]ver been Beaten up: big fag," and "Number of Drugs I have taken: big." *Id.* at 208. Critically, the student created this profile at his grandmother's house, outside of school hours, and on a non-school-issued computer. *Id.* at 207. Nevertheless, the high school responded by (among other punishments) suspending the student. *Id.* at 210. Both the district court and the Third Circuit determined that the student's suspension infringed his First Amendment rights. The district court focused on the nexus between the speech

and the material disruption, concluding that "several gaps in causation" failed to establish "a sufficient nexus between [the student's] speech and a substantial disruption of the school environment." *Layshock I*, 496 F. Supp. 2d at 600. Leaving that ruling intact, the Third Circuit elaborated on the nexus between the school and the student's grandmother's house, concluding that the school could not "stretch[] its authority into [his] grandmother's home and reach[] [him] while he is sitting at her computer after school." *Layshock II*, 650 F.3d at 216; *see also id.* ("It would be an unseemly and dangerous precedent to allow the state, in the guise of school authorities, to reach into a child's home and control his/her actions there to the same extent that it can control that child when he/she participates in school sponsored activities.").

This case presents another challenge as to where schools may regulate speech. Taking all inferences in favor of DeBenedetto and under the prevailing precedent as of February 2018, the Court holds that DeBenedetto's Amended Complaint states a plausible First Amendment violation. It alleges speech that occurred off-campus (DeBenedetto's home) and did not refer to the Lacey Defendants or Ocean. (Am. Compl. ¶¶ 11, 15-16.) It alleges that no nexus existed between the place of the speech and the school. (*E.g.*, *id.* ¶ 20 ("All of this conduct occurred at plaintiff's home and had literally nothing to do with his school or any other school."); *see Layshock II*, 650 F.3d at 216 (affirming district court that reversed suspension where contrary ruling would "[a]llow[] the [school] to punish [a student] for conduct he engaged in while at his grandmother's house using his grandmother's computer").) It further alleges that no nexus exists between DeBenedetto's speech and the school setting. (*E.g.*, *id.* (alleging that DeBenedetto's speech "ha[s] nothing to do with school events, or other students"); *see Layshock I*, 496 F. Supp. 2d at 600 (reversing suspension where school failed to show that other sources did not cause disruption and where "the

8

[s]chool ha[d] not demonstrated that the 'buzz' or discussions" were not caused by school reaction).) At this stage, these allegations are sufficient.

Defendants counter that *Layshock* and other student-speech cases give the schools license to regulate off-campus speech. True, as Defendants point out, the *Layshock* Court describes as an "unremarkable proposition" that "schools may punish expressive conduct that occurs outside of school, as if it occurred inside the 'schoolhouse gate,' under certain very limited circumstances." *Layshock II*, 650 F.3d at 219. But just because schools *may* punish off-campus speech under limited circumstances does not mean they can *always* punish that speech. Said another way, Defendants' proposition that schools may regulate off-campus speech simply raises the question before the Court: under what circumstances? Defendants do not answer that question. They do not answer, for example, how the school controlled or bore relation to the place of DeBenedetto's speech—his home.[5] They also do not answer what the likelihood of material disruption at the school was. Instead, they focus on the reasonableness of their actions following the Marjory Stoneman Douglas shooting. *But see Saxe*, 240 F.3d at 211 ("*Tinker* requires a specific and significant fear of disruption, not just some remote apprehension of disturbance."); *Tinker*, 393 U.S. at 508 ("[U]ndifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression."). Further, even if Defendants had answers to these questions,

---

[5] The Court need not now answer the question as to whether a substantial disruption on the school grounds itself is sufficient to show this nexus.

whether a likelihood of substantial disruption occurred and whether DeBenedetto's home bears any relation to the school grounds are factual questions inappropriate for resolution at this stage.[6]

## IV.    CONCLUSION

The Court holds that the Amended Complaint plausibly states a claim for relief under both the U.S. and State Constitutions. Thus, DeBenedetto may proceed with his causes of action under § 1983 and the Act. The Court will issue an order consistent with this Memorandum Opinion.

*[signature]*

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

---

[6] Regarding Ocean's argument that DeBenedetto has failed to allege a policy or custom for his *Monell* claim, the Court disagrees. Taking all inferences in favor of DeBenedetto, Ocean likely had *some* policy or custom under which it suspended DeBenedetto. Indeed, the Amended Complaint alleges (and Ocean does not dispute) that Ocean suspended DeBenedetto for disorderly conduct. (Am. Compl. ¶ 22.) Of course, that rationale implies that Ocean has some semblance of *orderly conduct*—that is, a custom that is sufficient at this stage to state a *Monell* claim. *See Lopez v. Bay Shore Union Free Sch. Dist.*, 668 F. Supp. 2d 406, 417 (E.D.N.Y. 2009) (concluding that school code of conduct and school board's upholding of suspension constituted custom or policy under *Monell*).